**THIS ORDER IS A PRECEDENT
OF THE TTAB**

**UNITED STATES PATENT AND TRADEMARK OFFICE**
**Trademark Trial and Appeal Board**
**P.O. Box 1451**
**Alexandria, VA 22313-1451**
General Contact Number: 571-272-8500
General Email: TTABInfo@uspto.gov
September 27, 2021

**Opposition No. 91235909**

*Intercontinental Exchange Holdings, Inc.*

*v.*

*New York Mercantile Exchange, Inc.*

**Opposition No. 91254514**

*Chicago Mercantile Exchange, Inc.*

*v.*

*Intercontinental Exchange Holdings, Inc.*

**M. Catherine Faint,
Interlocutory Attorney:**

These consolidated proceedings now come before the Board for consideration of

Chicago Mercantile Exchange Inc. and New York Mercantile Exchange, Inc.'s[1]

(collectively, "CME") contested and fully briefed motions, filed August 21, 2020, to:

1.  amend the Board's standard protective order ("SPO") to allow in-house counsel
    access to information and materials designated by Intercontinental Exchange
    Holdings, Inc. ("ICE") as "Confidential — Attorney's Eyes Only" (trade
    secret/commercially sensitive) ("AEO"); and

2.  find that the European Union ("EU") General Data Protection Regulation
    ("GDPR") does not apply in these consolidated Board proceedings.

---

[1] New York Mercantile Exchange Inc.'s attorney's change of correspondence address, filed
Sept. 22, 2021 is noted and entered.

## I.    Motion to Modify SPO

The Board's SPO is automatically imposed in all inter partes proceedings. *See* Trademark Rule 2.116(g), 37 C.F.R. § 2.116(g). Under the terms of the SPO, only outside counsel have access to confidential material and information that is designated as AEO. *See* TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 412.01 (2021). Information such as "sensitive business information, including highly sensitive financial or marketing information," and "competitive business information, including non-public financial and marketing analyses and strategic product/service expansion plans" may be designated as AEO. SPO at "1) Classes of Protected Information;" *see also* TBMP § 412.01(a). Parties, including their in-house counsel, quite clearly **do not** have access to AEO material and information under the automatic SPO. *U.S. Polo Ass'n v. David McLane Enters., Inc.*, 2019 USPQ2d 108442, at *3 (TTAB 2019); *Georgia-Pacific Corp. v. Solo Cup Co.*, 80 USPQ2d 1950, 1951 (TTAB 2006). However, the provisions in the SPO for the handling and disclosure of AEO information and materials by pro se litigants and in-house counsel may be modified by stipulation of the parties, approved by the Board, or upon motion granted by the Board.[2] Trademark Rule 2.116(g).

By its motion, CME seeks to designate "either" of two individuals identified as in-house counsel with access to AEO information, and provides that they are

---

[2] CME's motion states that the parties "have agreed to certain modifications" of the Board's SPO. 38 TTABVUE 4-5. A redlined version of the proposed amended order directed to disputed SPO terms at issue between the parties was attached to the motion, but did not include a redline of other proposed changes. *See id.* at 19-29. Any agreed amended protective order must be presented to the Board for approval. Trademark Rule 2.116(g), 37 C.F.R. § 2.116(g).

> Illinois licensed attorneys who are part of a multi-layered reporting structure within CME's Legal Department … do not regularly attend CME Board meetings, do not have business line authority, are not responsible for revenue generation, do not manage any CME businesses, and do not make decisions concerning pricing, product design, marketing, advertising and sales of CME's products and services. … In any negotiations, they are legal advisors.[3]

and

> they advise various of CME's business areas on legal issues related to intellectual property.[4]

CME does not support these statements with signed declarations from the named in-house attorneys, but with a copy of the declaration of a Managing Director, which was executed and filed over two years ago in unrelated litigation between the parties in the United States District Court for the Northern District of Illinois.[5]

ICE argues CME has failed to show good cause for modification of the Board's SPO. ICE asserts the named in-house attorneys are directors and assistant general

---

[3] 38 TTABVUE 7 citing Managing Director declaration at 32. From CME's arguments it appears that only one of CME's in-house counsel is to be granted this access. "Only one would be designated not both." 42 TTABVUE 5. However, it is unclear whether the Board is meant to choose which attorney is allowed to access AEO information and as the Board notes, there is not enough information provided about the roles of each counsel within the organization.

[4] CME Managing Director's declaration, 38 TTABVUE 32.

[5] In reply to ICE's response in opposition to the motion, CME included with its reply brief a more recent declaration with essentially the same wording signed by the same Managing Director on Sept. 29, 2020. *See* 42 TTABVUE 16-18. CME also attached the declaration of its outside counsel. *Id.* at 20-22. Generally, we would not consider these declarations as they are improper rebuttal for a reply brief. *See, e.g., Carefirst of Md., Inc. v. FirstHealth of the Carolinas, Inc.*, 77 USPQ2d 1492, 1498 (TTAB 2005), *aff'd*, 479 F.3d 825, 81 USPQ2d 1919 (Fed. Cir. 2007). However, since the revised declarations essentially correct the timeliness of the original declaration and provide the same information as the original declarations, we exercise our discretion to consider them.

counsel who provide advice on legal issues related to intellectual property concerning competitive strategic matters, including the terms and conditions of trademark licensing agreements.[6] ICE cites to *Intel Corp. v. VIA Techs., Inc.*,198 F.R.D. 525, 529-30 (N.D. Cal. 2000), as support for its contention that such intellectual property licensing constitutes competitive decision-making. This legal advice on strategic trademark licensing, argues ICE, confers substantial risk of inadvertent disclosure of AEO material to unauthorized recipients. ICE provided the declaration of its Vice President asserting that CME and ICE are "intense" and "direct" competitors and that disclosure of ICE's highly confidential data to its direct competitors CME "could severely and irreversibly harm ICE's businesses."[7]

CME argues in reply that access to AEO information by at least one in-house counsel "for each party" is "necessary" for them to properly advise their clients, that it is appropriate for the Board to modify the SPO because the named in-house counsel are not competitive decision-makers, and nothing in ICE's response demonstrates that access to AEO by one of them poses an unacceptable risk of inadvertent disclosure.

Federal Rule of Civil Procedure 26(c) allows a court, or in this case the Board, to protect from disclosure information that is, "a trade secret or other confidential research, development, or commercial information."[8] The Board, as with any tribunal,

---

[6] 39 TTABVUE 7-8.

[7] ICE Vice President's declaration, 39 TTABVUE 398.

[8] The Federal Rules of Civil Procedure are generally applicable to inter partes Board proceedings. See Trademark Rule 2.116(a), 37 C.F.R. § 2.116(a).

has broad discretion to modify a protective order for "good cause." *Rohrbough v. Harris*, 549 F.3d 1313, 1321 (10th Cir. 2008). *See also United States v. (Under Seal)*, 794 F.2d 920, 928 n.6 (4th Cir. 1986). *Cf. Pioneer Kabushiki Kaisha v. Hitachi High Techs. Am., Inc.*, 74 USPQ2d 1672, 1674 (TTAB 2005) (Board has discretion to enter protective order that discovery deposition not be had). The party seeking to modify a protective order bears the burden of demonstrating good cause for modification. *In re: Chiquita Brands Int'l, Inc.*, 965 F.3d 1238, 1250 (11th Cir. 2020) ("[P]arty moving to modify the protective order bears the burden to establish good cause for the modification.").

Accordingly, CME must show good cause for modifying the terms of the Board's SPO to allow disclosure of AEO material to in-house counsel. To establish good cause for the change CME as the movant must provide "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Flanders v. DiMarzio, Inc.*, 2020 USPQ2d 10671, at *2 (TTAB 2020) (cleaned up). *See also A. Hirsh, Inc. v. United States*, 657 F. Supp. 1297, 1303 (Ct. Int'l Trade 1987) (movant must show that, "the need for access outweighs the harm to the disclosing party and the forum's interest in maintaining confidentiality."). The need for access to confidential information, whether for outside or in-house counsel, must be shown based on "the factual circumstances surrounding each individual counsel's activities, association and relationship with a party." *U.S. Steel Corp. v. United States*, 750 F.2d 1465, 1468 (Fed. Cir. 1984).

CME has not provided enough information to determine the nature of the "legal issues related to intellectual property" on which CME's in-house counsel offer advice to enable the Board to weigh whether it constitutes advice and participation in competitive decision-making with the potential for inadvertent disclosure, nor has CME provided declarations from in-house counsel themselves to that effect. *See Georgia-Pacific v. Solo Cup*, 80 USPQ2d at 1953.

In recognizing that "inappropriate release of confidential information can never be fully remedied," the Federal Circuit has affirmed that access to sensitive AEO information by in-house counsel is not granted as a matter of right, but involves a balancing between the need to protect confidential AEO information and the needs of in-house counsel to participate in the litigation process. *Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1483-84, 1 USPQ2d 1241, 1249 (Fed. Cir. 1986).

The three-part balancing test underlying the determination balances whether, to whom and under what conditions a protective order can be amended to allow release of AEO to in-house counsel. Factors underpinning the Board's determination include:

(1) consideration of a party's need for the confidential information in order to adequately prepare its case,
(2) the harm that disclosure would cause the party submitting the confidential information, and
(3) the forum's interest in maintaining the confidentiality of the information sought.

*Id*.

The Court of Appeals for the Federal Circuit in *U.S. Steel* framed balancing of the harm caused by disclosure in terms of whether counsel seeking access was involved in competitive decision-making which included, "any or all" decisions that are

influenced by "similar or corresponding information about a competitor." *U.S. Steel,* 730 F.2d at 1468 n.3. Applying *U.S. Steel,* the Northern District of California addressed the issue of whether in-house counsel's active involvement in negotiating licensing agreements implicates competitive decision-making. *Intel Corp. v. Via Techs.,* 198 F.R.D. at 530. The *Intel* court held that as the evaluation of licensing agreements included evaluating technical information, marketing information and the strength of a competitor's related products, access to such confidential information may provide a competitive advantage presenting a risk of inadvertent disclosure of confidential information by the attorney seeking access to that information. *Id.*

Absent consent, if the standard protective order is to be disturbed, the Board must be able to balance the risk of inadvertent disclosure of trade secrets or commercially sensitive matter against the risk that protection of those trade secrets will impair CME's prosecution of its claims. *See Brown Bag Software v. Symantec Corp.,* 960 F.2d 1465, 22 USPQ2d 1429, 1433 (9th Cir. 1992) (finding balancing test will best resolve discovery disputes relating to protection of trade secrets).

CME has not provided individual declarations from the two proposed in-house counsel as to their specific duties. Factual information regarding, "each individual counsel's activities, association, and relationship with a party" are necessary for weighing "the facts on a counsel-by-counsel basis." *U.S. Steel,* 730 F.2d at 1468. CME's minimal showing is insufficient for the Board to conclude that CME's in-house counsel are not involved in competitive decision-making, particularly as they are

involved in "legal issues related to intellectual property" which include licensing agreements.[9] *See Georgia-Pacific. v. Solo Cup*, 80 USPQ2d at 1953 (finding lack of declarations from counsel seeking access to AEO made for minimal showing of need and potentially presented unacceptable risk of inadvertent disclosure).

Even if CME had provided sufficient information regarding its in-house counsel, CME has not clearly demonstrated that it has met the requirements of the first part of the balancing test, a need for access to the highly sensitive competitive information it seeks to adequately prepare its case, particularly where it has retained competent and experienced outside counsel. CME argues that "the fact that CME is … represented by outside counsel in these proceedings is irrelevant when [in-house counsel] do not participate in any competitive decision-making."[10] However, as the party seeking to access competitive information, CME must be able to show that its ability to litigate will be prejudiced by allowing access to the information solely to outside counsel. *See A. Hirsh, Inc. v. United States*, 657 F. Supp. at 1305 (finding need to access competitive information satisfied by disclosure to outside counsel). As CME has provided no evidence of how they would be prejudiced in prosecuting their case by allowing access to outside counsel only, CME has not shown good cause for modifying the SPO.

Assessing the second factor—the harm to ICE from potential disclosure of its competitive information—necessitates a weighing of the risk of inadvertent

---

[9] 38 TTABVUE 32.

[10] *Id*. at 11.

disclosure. *U.S. Steel*, 730 F.2d at 1468; *Brown Bag*, 960 F.2d at 1470, 22 USPQ2d at 1433 (finding proper review of protective orders requires factual examination of all risks and disclosures by any counsel). While CME argues that its proffered in-house counsel are not involved in competitive decision-making, ICE counters that both CME's named in-house counsel provide advice regarding strategic licensing decisions and regularly interact with CME business teams.[11] Such activities have been found to present a risk of competitive disadvantage. *Intel Corp.*, 198 F.R.D. at 530. Accordingly, we find potential disclosure of ICE's competitive information may provide a competitive advantage to CME and such disclosure would harm ICE.

Regarding the Board's interest in maintaining confidentiality of the information sought, sensitive business information is central to the Board's fact-finding process. *See Hunter Indus., Inc. v. Toro Co.*, 110 USPQ2d 1651, 1656 n.12 (TTAB 2014) (noting Board routinely permits designation of sensitive business information as confidential); *Georgia-Pacific v. Solo Cup*, 80 USPQ2d at 1952 (Federal Rules explicitly authorize Board to order protection of trade secret or other confidential information). *See also* Trademark Rule 2.116(g) (automatically imposing Board's SPO).

In view of the Board's limited jurisdiction and the narrowness of issues decided in Board cases, discovery in Board cases is generally narrower than that in court proceedings. *Frito-Lay N. Am., Inc. v. Princeton Vanguard, LLC*, 100 USPQ2d 1904, 1907 (TTAB 2011), *rev'd on other grounds*, 786 F.3d 960, 114 USPQ2d 1827, 1833

---

[11] 39 TTABVUE 7.

(Fed. Cir. 2015). The Board's SPO provides both parties with a means to properly protect highly confidential information while streamlining discovery procedures, decreasing discovery disputes and their concomitant expenses and preserving Board resources. *See Intex Recreation Corp. v. Coleman Co.*, 117 USPQ2d 1799, 1801 (TTAB 2016) (finding Board's SPO rather than redaction of documents provided adequate protections for confidential information). The Board's interest in providing a means for protecting confidential information and protecting against its inappropriate release aids the Board in carrying out its statutory responsibilities in the registration of trademarks.

Weighing the information provided in light of the evidence and arguments of the parties, the Board finds that CME has failed to clearly demonstrate good cause and a need for access to ICE's confidential business information by in-house counsel. Accordingly, CME's motion to amend the protective order is **denied**.

## II.     The Board's SPO Sufficiently Protects Confidential Discovery

CME next raises the issue of whether ICE may validly redact names, email addresses, and other information from documents and electronically stored information (ESI) originating in the EU prior to its production on the basis that the GDPR requires such redaction. CME argues that because ICE "waited more than 18 months" to assert the objection it should be deemed waived, that CME will be severely

10

prejudiced if ICE is allowed to assert the objection, and that several federal district courts have held that the GDPR does not apply to cases before them.

In response, ICE argues that the GDPR requires ICE to redact information regarding certain of its employees, executives and officers who work through ICE offices in the EU, there is no need for it to produce such information in response to CME's discovery requests, and requiring ICE to produce such information carries a substantial risk of monetary harm to ICE in the form of potential monetary penalties under the GDPR.

CME argues that ICE ignores the "key fact" that ICE affirmatively asserts rights in the term BRENT and will rely upon ICE's acquisition of UK-based International Petroleum Exchange to establish prior rights, yet seeks to use the GDPR to shield discovery and prevent CME from defending against this opposition.

The GDPR is an EU regulation made effective May 25, 2018 that aims to protect the privacy and security of EU citizens' personal data by limiting the transfer of such information among member states of the EU, as well as between the EU and other countries such as the United States.[12] The broad definition of "personal data" under the regulation, includes "any information relating to an identified or identifiable

---

[12] *See What is GDPR, the EU's new data protection law?*, available at https://gdpr.eu/what-is-gdpr/ (last visited Sept. 27, 2021). The Board exercises its discretion to take judicial notice of the EU regulations and definitions regarding the GDPR. *See Syngenta Crop Protection Inc. v. Bio-Chek LLC*, 90 USPQ2d 1112, 1117 (TTAB 2009); *Litton Bus. Sys., Inc. v. J.G. Furniture Co.*, 190 USPQ 431, 433 (TTAB 1976).

natural person." GDPR Art. 4(1).[13] Such information would include an individual's name, position, job title and email address, information that generally must be produced in discovery pursuant to the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 26(b)(1); *see also* 8 WRIGHT & MILLER, FED. PRAC. & PROC. CIV. § 2013 (3d ed. Sept. 2021).

A foreign country's law precluding disclosure of evidence in U.S. courts and tribunals will generally not deprive those courts and tribunals of "the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court*, 482 U.S. 522, 544 n.29 (1987). The party seeking to protect information from discovery under foreign law "has the burden of showing such laws bar production." *In re Air Crash at Taipei*, 211 F.R.D. 374, 377 (C.D. Cal. 2002) (quoting *United States v. Vetco, Inc.*, 691 F.2d 1281, 1288 (9th Cir. 1980)).

By its terms, the GDPR does not per se bar disclosure of protected data in litigation. Article 49(1)(e) provides for data transfers where, "the transfer is necessary for the establishment, exercise or defence of legal claims."[14] The overarching

---

[13] GDPR, available at https://gdpr.eu/article-4-definitions/ (last visited Sept. 27, 2021). *See also What is considered personal data under the EU GDPR?*, available at https://gdpr.eu/eu-gdpr-personal-data/ (last visited Sept. 27, 2021).

[14] Article 49 GDPR – *Derogations for specific situations*, available at https://gdpr.eu/article-49-when-can-personal-data-be-transfered/ (last visited Sept. 27, 2021).

requirement of this exception, or derogation, is that the data transfer must be limited to what is "relevant and necessary" to the litigation.[15]

In *Societe Nationale*, the U.S. Supreme Court noted international comity requires a particularized analysis of the interests implicated by a foreign law and the interests of the United States, and adopted the multi-factor balancing test set forth in the Restatement (Third) of Foreign Relations Law § 442(1)(c), which seeks to balance the interests of the United States and the party seeking the discovery against the foreign state's interest in secrecy. *In re Air Crash*, 211 F.R.D. at 377. The five factors to consider in this balancing of competing interests are:

> (1) the importance to the litigation of the documents or other information requested;
> (2) the degree of specificity of the request;
> (3) whether the information originated in the United States;
> (4) the availability of alternative means of securing the information; and
> (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interest of the state where the information is located.

*Societe Nationale*, 482 U.S. at 544 n.28. *See also In re Mercedes-Benz Emissions Litig.*, 2020 U.S. Dist. LEXIS 15967, at *18-19, 2020 WL 487288, at *6 (D.N.J. Jan. 30, 2020). The Board considers the applicability of the GDPR using this multi-factor balancing test.

As to the first factor, ICE argues that the names and addresses attached to the emails sought are not "necessary" to the litigation. The identity of the sender of a

---

[15] *See Guidelines 2/2018 on Derogations of Article 49 Under Regulation 2016/679*, European Data Protection Board 1 (May 25, 2018), available at https://edpb.europa.eu/our-work-tools/our-documents/guidelines/guidelines-22018-derogations-article-49-under-regulation_en (last visited Sept. 27, 2021).

13

document is irrelevant, ICE argues, because the "key question" in this proceeding is whether the public, not the trademark owner, considers the trademark, BRENT, as a mark, or considers it as the genus of goods in question.[16] CME argues that it must be allowed to obtain evidence of the public's understanding of the term from any competent source and that any redaction will severely prejudice CME and prevent it from identifying those persons who have discoverable information and should be deposed.

The basic identity and contact information of current or former employees or of current or former employees of third parties or of consumers who sent or received pertinent emails or communications is directly relevant to the claims in this dispute. Such basic information produced by relevant responsive documents is important for authentication of the documents produced or to identify parties who may have discoverable information, and is directly relevant to whether the mark is used in a descriptive or generic manner by those senders and recipients. *See Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1475 (9th Cir. 1992) (where evidence is directly relevant, first factor may weigh in favor of disclosure); *Colt Defense LLC v. Bushmaster Firearms, Inc.*, 486 F.2d 701, 82 USPQ2d 1759, 1763 (1st Cir. 2007) (finding email messages from consumers and generic use of term by party seeking trademark protection relevant to showing term was generic); *Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429, 440 (E.D.N.Y. 2008) (where documents are highly relevant and important to claims and defenses, first factor weighs heavily in favor of

---

[16] 39 TTABVUE 15.

14

party seeking discovery); *see also In re Mercedes-Benz*, No. 2:16-cv-881 (SDW)(JAD), 2019 U.S. Dist. LEXIS 223132, at *10, 2019 WL 5800270, at *2 (D.N.J. Nov. 7, 2019) (finding names, addresses and professional contact information of relevant current or former employees or third parties directly relevant "by its very nature"), *aff'd, In re Mercedes-Benz Emissions Litig.*, No. 2:16-cv-881, 2020 U.S. Dist. LEXIS 15967, 2020 WL 487288 (D.N.J. Jan. 30, 2020); *Varian Assocs. v. Fairfield-Noble Corp.*, 188 USPQ 581, 58 (TTAB 1975) (names and addresses of knowledgeable employees are discoverable). The Board's SPO provides a mechanism for the protection of confidential information whereby a party seeking to protect the names of individuals from public disclosure may upon sufficient showing allow such names to be provided subject to confidentiality protections, and thus redacted from public view in an appropriate case. But ICE seeks full redaction beyond that provided by the SPO and has not made a showing as to why basic discoverable information submitted under protective order should be redacted. This factor weighs in favor of production.

As to the second factor, ICE argues that CME's document requests lack specificity and seek "a huge volume" of documents over a forty-year span.[17] CME argues that the parties have already addressed these issues and clarified and reduced the scope of requested documents and ESI, narrowly tailoring them so that they seek specific discovery necessary to CME's case which should mitigate privacy concerns. Further, CME argues, the GDPR came into effect on May 25, 2018 while ICE served its written

---

[17] 39 TTABVUE 15.

responses and objections to discovery in October 2018, but waited until March 2020 to assert its potential objection based on the GDPR.

CME's narrowing of its requests to seek only representative documents is sufficiently specific, seeks the production of business records commonly produced in U.S. litigation, and is not unduly burdensome. *See, e.g.*, *Frito-Lay*, 100 USPQ2d at 1910 (requiring production of representative samples of documents, including ESI, relevant to issues in proceeding). This factor weighs in favor of disclosure. *In re Air Crash,* 211 F.R.D. at 378. *See also Giorgi Glob. Holdings, Inc. v. Smulski*, No. CV 17-4416, 2020 WL 2571177, at *2 (E.D. Pa. May 21, 2020) (finding second factor favors production where document production requests were sufficiently specific and defendant had agreed to produce documents prior to invoking GDPR).

With regard to the third factor, ICE asserts that although it is located in the U.S., it operates "a number of EU-based offices" with servers for storing information located in both the U.S. and the EU. Where, as here, the party seeking to redact or otherwise withhold the information is a U.S. company[18] subject to U.S. discovery law, discovery is normally permitted, particularly where the documents, even if located in foreign countries, are in the possession or control of the U.S. company. *Societe Nationale*, 482 U.S. at 544 n.29 (foreign countries' statutes precluding disclosure of evidence "do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute."); s*ee also Vetco*, 691 F.2d at 1290 (where Swiss corporations were controlled

---

[18] ICE is a Delaware corporation with its principal place of business located in Atlanta, Ga. 17 TTABVUE 2.

16

subsidiaries of U.S. firms third factor weighed in favor of production); *see also Finjan v. Zscaler*, No. 17-cv-06946-JST (KAW), 2019 U.S. Dist. LEXIS 24570, at \*7, 2019 WL 618554 at \*2 (N.D. Cal. Feb. 14, 2019) (finding third factor weighs "somewhat in favor of disclosure" where defendant is American company subject to American law). This factor favors that the production be unredacted and produced under a tier of confidentiality as set forth in the Board's SPO.

Regarding the fourth factor, ICE argues that obtaining the information is unnecessary because it will produce documents from its U.S.-based personnel and only EU-based materials will have the "unnecessary" names and other personal information redacted. ICE also argues that CME may obtain the same or similar information from US-based documents and may depose a corporate witness to testify as to certain information contained in the documents. ICE has not produced any documents, so it is not possible to substantiate its claims that the same information may be available from US-based personnel. Information regarding names of those who have sent or received communications is basic, discoverable information and redaction of that information, or limitation to only U.S.-based personnel is not the same as supplying this basic information. The suggested redaction is not an equivalent alternative in a US-based discovery dispute seeking relevant discoverable information. *See Richmark*, 959 F.2d at 1475 (where evidence is directly relevant, disclosure is favored). This factor weighs in favor of disclosure.

The fifth factor, the extent to which noncompliance would undermine important interests of the United States, has been described as "the most important factor."

*Richmark*, 959 F.2d at 1476. The Trademark Trial and Appeal Board is an administrative tribunal of the United States Patent and Trademark Office, empowered to determine the right to register a trademark in the United States. *See* Trademark Act § 17, 15 U.S.C. § 1067. The United States has a strong interest in ensuring parties in proceedings before the Board have access to the information they need to litigate their claims and for the Board to fully and fairly adjudicate them. *See, e.g.*, *B&B Hardware, Inc. v. Hargis Indus.*, 575 U.S. 138, 158 (2015) (TTAB procedures are largely the same as those of federal courts). The interest of the United States to determine the registrability of marks under U.S. trademark law and their entry on the Trademark Register is substantial and requires the production of relevant discovery.

ICE argues it is "at risk of substantial monetary penalties" under the GDPR, while also arguing for absolute protection for the EU-based information. As noted, protection against disclosure under the GDPR is not absolute; "relevant and necessary" information may be produced in litigation.[19] ICE has not identified how disclosure of this information, under the terms of the Board's SPO, will violate the GDPR when a protective order is in place, nor has it shown that there has been any actual enforcement of the GDPR where protected information has been produced under a protective order in U.S. litigation. *See Richmark*, 959 F.2d at 1475 (lack of enforcement by foreign state may be additional factor to consider).

---

[19] *See Finjan*, 2019 U.S. Dist. Lexis 24570, at *9; 2019 WL 618554, at *3. *See also Guidelines 2/2018 on Derogations of Article 49 Under Regulation 2016/679, supra* n.15, at 2.5.

Further, the weight of the foreign privacy interest is considered diminished where a protective order preventing disclosure of information as confidential has been entered. *Vetco*, 691 F.2d at 1289 (finding Switzerland's interest in protecting privacy diminished where information was required to be kept confidential). The Board's SPO is in place and can be invoked to protect the personal data of any EU employees and third parties. This factor weighs in favor of disclosure.

Weighing all of the factors in light of the Board's SPO and its confidentiality provisions which allow the producing party to produce information subject to protections on the use and dissemination of that information, the Board finds ICE is sufficiently protected and rejects ICE's argument that the GDPR per se requires ICE to redact the relevant business records as the Board's SPO provides a means for protecting any sensitive personal information. Accordingly, ICE is **ordered** to produce the responsive information in unredacted form to CME subject to the appropriate tier of confidentiality under the Board's SPO.[20]

### III.  Schedule

Proceedings are resumed. Dates are reset as set out below. As the parties are in reversed positions in the now consolidated oppositions, a counterclaim schedule will be utilized. ICE, as plaintiff in the first filed opposition, is in the position Plaintiff and CME is in the position of Counterclaim Plaintiff in the schedule set out below.

| | |
|---|---|
| Expert Disclosures Due | 11/21/2021 |

---

[20] If the parties enter into their own stipulated protective order, a copy of the executed agreement should be filed with the Board. Such an order may not be used as a means of circumventing paragraphs (d) and (e) of Trademark Rule 2.27, 37 C.F.R. § 2.27. *See* TBMP § 412.02(a).

| | |
|---|---|
| Discovery Closes | 12/21/2021 |
| Pretrial Disclosures Due for Party in Position of Plaintiff in Original Claim | 2/4/2022 |
| 30-day Trial Period Ends for Party in Position of Plaintiff in Original Claim | 3/21/2022 |
| Pretrial Disclosures Due for Party in Position of Defendant in Original Claim and in Position of Plaintiff in Counterclaim | 4/5/2022 |
| 30-day Trial Period Ends for Party in Position of Defendant in Original Claim, and in Position of Plaintiff in Counterclaim | 5/20/2022 |
| Pretrial Disclosures Due for Rebuttal of Party in Position of Plaintiff in Original Claim and in Position of Defendant in Counterclaim | 6/4/2022 |
| 30-day Trial Period Ends for Rebuttal of Party in Position of Plaintiff in Original Claim, and in Position of Defendant in Counterclaim | 7/19/2022 |
| Pretrial Disclosures Due for Rebuttal of Party in Position of Plaintiff in Counterclaim | 8/3/2022 |
| 15-day Trial Period Ends for Rebuttal of Party in Position of Plaintiff in Counterclaim | 9/2/2022 |
| Opening Brief for Party in Position of Plaintiff in Original Claim Due | 11/1/2022 |
| Combined Brief for Party in Position of Defendant in Original Claim and Opening Brief as Plaintiff in Counterclaim Due | 12/1/2022 |
| Combined Rebuttal Brief for Party in Position of Plaintiff in Original Claim and Brief as Defendant in Counterclaim Due | 12/31/2022 |
| Rebuttal Brief for Party in Position of Plaintiff in Counterclaim Due | 1/15/2023 |
| Request for Oral Hearing (optional) Due | 1/25/2023 |

Generally, the Federal Rules of Evidence apply to Board trials. Trial testimony is taken and introduced out of the presence of the Board during the assigned testimony periods. The parties may stipulate to a wide variety of matters, and many requirements relevant to the trial phase of Board proceedings are set forth in Trademark Rules 2.121 through 2.125. These include pretrial disclosures, the manner and timing of taking testimony, matters in evidence, and the procedures for submitting and serving testimony and other evidence, including affidavits, declarations, deposition transcripts and stipulated evidence. Trial briefs shall be

submitted in accordance with Trademark Rules 2.128(a) and (b). Oral argument at final hearing will be scheduled only upon the timely submission of a separate notice as allowed by Trademark Rule 2.129(a).

**\*\*\***